**PHILADELPHIA POLICE AND FIRE ASSOCIATION FOR HANDICAPPED CHILDREN, INC., et al.**

v.

**CITY OF PHILADELPHIA, et al.**

**Civ. A. No. 88–5305.**

United States District Court,
E.D. Pennsylvania.

Nov. 17, 1988.

David Ferleger, Philadelphia, Pa., for plaintiffs.

Laura Fredricks, Deputy Atty. Gen., Donald M. Donaldson, Sr. Deputy Atty. Gen., Philadelphia, Pa., for John White and Steven Eidelman.

Richard J. Gold, Chief Deputy and Doris M. Leisch, Chief Asst. City Sol., Philadelphia, Pa., for City defendants.

**MEMORANDUM**

RAYMOND J. BRODERICK, District Judge.

This is a class action which was filed by mentally retarded Philadelphians living at home. The City of Philadelphia, on or about June 10, 1988, notified its Base Service Units (BSU's) and all retardation agencies that because of a fiscal deficit in the funds allocated to the city for mental retardation programs by the Commonwealth of Pennsylvania in the amount of approximately $6.8 million, certain services then being provided to the mentally retarded living at home in Philadelphia would be terminated as follows: 540 (59%) persons would lose their vocational placements; 550 of 1800 families (30%) would be denied continued Family Support Services; 150 of 1,500 pre-school children would have Early Intervention services terminated; and that a 50% reduction in Case Management Services would result. The members of the plaintiff class contend that the proposed termination of these services violates their constitutional rights and request this Court to enjoin both the City of Philadelphia and the Commonwealth of Pennsylvania from terminating these services.

Plaintiffs filed motions for a preliminary injunction and for a temporary restraining order. Following a hearing, the Court issued a TRO effective August 1, 1988, which ordered defendants to maintain services "to all retarded persons who were receiving such services as of June 1, 1988 on the same basis and to the same extent as such services were provided as of June 1, 1988." By agreement of the parties, the Court entered an Order, subsequently modified, stating that the TRO would remain in effect until midnight on September 29, 1988.

On September 15, 1988, the Court issued an Order as stipulated by the parties certifying this matter as a class action under Fed.R.Civ.P. 23(a) and (b)(2). The class was defined to include "all persons who are now or are later registered as clients with retardation with the City of Philadelphia and its Base Service Units." All members

of the class are retarded [1] individuals residing in Philadelphia. The Court having on August 9 severed all issues concerning retarded citizens of Philadelphia who are on waiting lists for service, it was understood that the case would proceed solely on the issues presented by the termination of services to the members of the plaintiff class who are residing at home in Philadelphia with their families and who would be deprived of services pursuant to the determination of the City defendants on June 10, 1988, as heretofore set forth.

In accordance with Fed.R.Civ.P. 65(a)(2), the hearing on the merits was consolidated with the hearing on the motion for a preliminary injunction and the hearing was held before the Court from September 26 to September 29, 1988. The parties once again agreed to extend the TRO, until October 14, 1988, and they made subsequent agreements to keep the TRO in effect through November 17, 1988.

At the conclusion of the presentation of evidence on September 29, this Court made a finding and pointed out to the parties that it was somewhat unique to this civil dispute that all the parties-the plaintiffs; the City of Philadelphia and city officials Dr. Maurice Clifford, Commissioner of the Department of Health and Robert W. Glover, Administrator of the Health Department's Office of Mental Health and Mental Retardation ("City defendants"); and John White, Jr., Secretary of the Pennsylvania Department of Public Welfare (DPW) and Steven Eidelman, Deputy Secretary for Mental Retardation, DPW ("State defendants")—were in agreement that the termination of services to the members of the plaintiff class would result in irreparable injury to them and cause serious regression to many of them. At the conclusion of the trial, the Court issued an Order which directed representatives of the plaintiffs; the state defendants; and Dr. Glover and Kathy Sykes, Acting Director of Mental Retardation Services for the City; to meet in Harrisburg in an effort to bring about a settlement of this litigation and to make every effort to have the Governor of this Commonwealth and the Mayor of the City of Philadelphia attend this meeting.

On October 14, the Commonwealth defendants advised the Court that because of the Governor's schedule they had been unable to arrange the meeting and requested an additional two weeks to do so. Finally, the Court was advised by counsel for the plaintiffs that a meeting at which settlement was discussed had taken place on October 28, 1988, and that neither the Governor nor the Mayor attended that meeting. The parties having been unable to settle the case, the Court ordered oral argument as to injunctive relief which oral argument was held on November 7, 1988.

Based upon the evidence presented at trial, the facts stipulated to by all parties, and in consideration of the briefs and proposed findings of fact and conclusions of law submitted by the parties, the Court makes the following findings of fact and conclusions of law.

Plaintiff Philadelphia Police and Fire Association for Handicapped Children, Inc. ("PPFA") is a non-profit organization composed largely, but not exclusively, of families of City of Philadelphia police officers and firefighters. PPFA advocates for the handicapped and provides services to them. Many of its member families include retarded individuals.

The members of the class vary in age from infancy to adulthood and in capability from the mildly impaired to the severly and profoundly retarded. All of the members of the plaintiff class hereinafter referred to reside at home with their families.

As noted above, the members of the plaintiff class are threatened with the loss of vocational or day services, family support services, early intervention programs and case management. The services provided to the class members divide into two main budgetary categories—Non–Resi-

---

**1.** Those with retardation have significantly sub-average intellectual functioning which originates in the developmental period and significant defects in social functioning. Many of the retarded are also afflicted with other problems such as seizures, cerebral palsy, and defects in mobility, sensory abilities or communications skills.

dential Services and Early Intervention. These must be distinguished from so-called Community Residential Services. Community residential services, as defined by the parties, are services delivered to those retarded individuals who reside in Community Living Arrangements ("CLA's") funded by the Commonwealth. Non-residential services are provided to the client and the client's family and in general are intended to provide habilitation[2] to those retarded individuals who live at home with their families. The nonresidential services being terminated include such services as: case management (case managers assist the client and family in developing a life management plan and in coordinating and ensuring the receipt of all other services necessary for habilitation); adult day care; pre-vocational training and sheltered workshops; family support services (assists the family in supporting retarded family members at home by providing such aid as respite care, financial assistance for recreational programs, homemaker services, therapy, and equipment); and early intervention services (intended to facilitate the developmental progress of retarded preschool children and includes such services as physical, recreational, speech and occupational therapy, psychological services, parental support and medical services).

Delivery of the above described community based services is funnelled through 13 BSU's located throughout the city, which handle all intake into the mental retardation system. Each BSU is a non-profit organization under contract with the City of Philadelphia. The BSU's are responsible for overall planning and coordination of service delivery to each client. Many services are provided directly by the BSU; others are supplied by a host of other providers. The particular mix of services given to an individual client is determined in accordance with an individually tailored plan which is prepared by a professional interdisciplinary team. The team is composed of the client, a family member or members, and a variety of professionals.

It is clear that the families of the class members play a key role in the delivery of services to the retarded. Motivated solely by love and the highest regard for familial obligation, these families spend untold hours caring for the members of the plaintiff class, wholly without financial remuneration. Families are the primary providers of services to the retarded who live at home. They do so at the least cost to the taxpayer. Family support programs have been designed to help families care for their own retarded loved ones at home.

The habilitation services provided to the retarded who are living at home are provided by the City of Philadelphia with funding contributed 90% by the state. The City provides a 10% match of state funds to pay for non-residential services pursuant to state law. Since at least 1981, the City has annually contributed $3 million for residential services in addition to its 10% match for non-residential services. Accordingly, the programs that are operated by the City of Philadelphia, through its Office of Mental Health and Mental Retardation, are primarily supported by funds allocated by the Commonwealth of Pennsylvania through its Department of Public Welfare.

The Commonwealth and City were aware from at least July, 1987 that there would be a deficit in funding for retardation services in Philadelphia for fiscal year 1988 (ending June 30, 1988). No action was taken, however, until March, 1988, after the City announced cutbacks in retardation programs. These cutbacks were avoided by the Commonwealth providing a $1.2 million supplemental appropriation in June, 1988. From February to April, 1988, the City and Commonwealth agreed to work together to prevent a similar crisis from happening in the 1989 fiscal year. The state defendants, for reasons hereinafter set forth, have been unable to persuade the Court that the funding issue in this case is solely a problem to be resolved by the City.

---

**2.** "Habilitation" defines the process of teaching and training the retarded basic life and social skills.

It was obvious to all involved that the same problems that created the shortfall in retardation funds in FY 1988 would recur in fiscal year 1989. When the state defendants submitted their budget request in February, 1988 for fiscal year 1989, no money was included to cover Philadelphia's anticipated deficit in retardation funds. D.P.W. Secretary White appears to have taken the position that additional funds should not be provided by the state on the ground that the City has not agreed to provide more than its 10% match mandated by state law. The record shows, however, that the City of Philadelphia has contributed $3 million annually in excess of its 10% match. Since May 1988, the Commonwealth has been aware and has acquiesced in the City's plan to keep intact all residential services and to only cut habilitation services to the retarded class members living at home with their families.

In order to cure the deficit, the defendants decided to terminate services to those living at home as follows: 540 people would lose vocational/day services; 550 would be denied family support services; 150 pre-schoolers would be deprived of early intervention programs; and case management services would be reduced 50%. Each of these service categories is critical to the habilitation program for those retarded individuals residing at home. The reductions in service proposed by the defendants would result in irreparable injury to each member of the class, as well as to the class members' families, many of whom are aged or infirm parents living on limited incomes.

The services provided to the members of the class were, for each individual, recommended by his or her professional interdisciplinary team as necessary for habilitation. Necessarily, the spending reductions will adversely impact the growth and development of the class members. The impact of the service reductions is perhaps easier to describe on an aggregate basis given the uniqueness of the needs, the services delivered, and the harm to each individual member of the class. But the Court is keenly aware of the fact that the harm to the plaintiff class would be felt individually by each class member and his or her family. Elimination of a day program such as vocational training or a workshop can deprive the client of the dignity of earning a paycheck as well as the educational and socialization aspects of the program. It may also require a parent to quit a job in order to be at home each day to take care of their retarded loved one. Reductions in early intervention programs can unnecessarily limit the future intellectual growth of the pre-school retarded child only to require increased support in the school and when the child reaches adulthood. When social and recreational programs are cut back, there is a concomitant loss of self respect, opportunities for friendship, fun, and romance not available within the family, together with increased burdens on the family.

The mentally retarded require a constant habilitative program simply to maintain their skills. Reduced services will cause such harm as decreased communication, social, vocational, physical, intellectual, and self-care skills and increased aggression, self-abuse and frustration to the individual. Termination of habilitative programs may make necessary the use of medication with its adverse side effects. No matter how the regression may manifest itself, each member of the class will suffer a setback in the path towards maximum independence, normalization and self-fulfillment. The incidence of emergencies requiring special intervention would undoubtedly increase if habilitative services are terminated.

The Court has observed that there is no material dispute between the parties as to the fact that the members of the class will suffer. It was the city defendants, with the advice, consent and acquiescence of the state defendants, who decided to terminate habilitation services to the retarded living at home in order to balance the budget for the retarded.

First, they decided to achieve savings by solely cutting services to the mentally retarded living at home with their families. Residential services, i.e. services provided to those retarded citizens living outside the

home in Community Living Arrangements, were categorically excluded from consideration.

Second, they split non-residential services into "hard" and "soft" categories and decided to make more cuts in the latter category. Hard services are those which are tangible and are directly provided to the client, while soft services are indirect services. The result of this decision was that Case Management, a soft service, suffered by far the largest percentage cutback—50%—while Family Support Services, Early Intervention Programs and Vocational Services had proportionately smaller reductions. No rationale was articulated by the defendants to explain the derivation of the specific budget reductions planned within the non-residential services category. The defendants appear to have arbitrarily selected a set of figures to attain the desired total of $6.8 million, having decided only to cut soft services deeper than hard services. Once this set of numbers was divined, no attempt was made to fine tune the numbers or to perform any analysis as to what different mix of program results would follow from a different set of numbers.

It is also apparent that the defendants "backed into" the proposed budget from the top down, in that the cuts were made in the aggregate, for the entire mental retardation budget. In so doing, the defendants did not perform a "needs based" analysis in order to cut spending on an individual client basis.

The defendants, together with other State and City officials, regularly discussed the funding problem and the proposed cutbacks for months before any cuts were implemented. Despite their knowledge of the likely impact of the proposed cuts, no additional revenues were made available.

It was the state defendants, not the legislature, who determined how much funding Philadelphia would receive for services to the retarded and when they did so they were aware that the amount allocated to the City would create the deficit in the City's FY 1989 budget for the retarded. State policies and budgeting over a period of years have contributed to the current crisis. Statewide, funding for mental retardation has lagged far behind inflation. The City of Philadelphia has been underfunded because of the criteria, some of which have been changed in the last two years, which are used by the state defendants to divide the funding between the counties. Historically, these criteria have ignored the higher cost of living in the City and have relied on performance assessments which reduced Philadelphia's funds relative to the rest of the State. From FY 1983 to FY 1988, Philadelphia ranked dead last among the counties as to the percentage increase in its funding, at 20.5%. The highest increase was 29%. Had Philadelphia been allocated an average increase of 24.53% during this period, it would have received an additional amount of almost $6 million from the state defendants.

## DENIAL OF EQUAL PROTECTION

Plantiffs contend that the administrative decision to cut habilitation services only to the retarded living at home unconstitutionally discriminated between those mentally retarded who live with their families and those who live in residences provided by the defendants. The Court agrees.

The right to equal protection of the laws guaranteed by the Fourteenth Amendment applies not only to discriminatory legislation, but also to discriminatory governmental conduct in the execution or administration of the laws. *See, Columbus Bd. of Ed. v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). If benefits are distributed unequally, the classifications chosen by the government are subject to judicial scrutiny. *Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985). Defendants herein have jointly established a system to deliver essential habilitative services to the mentally retarded as provided for by state law. Because of a budgetary shortfall, defendants divided the mentally retarded into two categories in order to allocate spending reductions—those living at home with their families and those living elsewhere. Funding for those living at home, i.e. the non-residential services, was severely reduced while funding for the re-

tarded living elsewhere, i.e. residential services, was actually increased. (Stip. ¶ 257–58). All of the members of both groups are highly dependent upon the defendants for habilitative services. Although they are similarly situated with respect to their need for habilitation, the defendants have not treated them similarly.

Defendants argue that since distinguishing the retarded according to residence involves no suspect or quasi-suspect classification, the determination is presumed valid and is beyond constitutional attack if the classification is "rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). When "the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment," *Mathews v. de Castro*, 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976), it will not meet the rational basis test.

■ The Court finds that the defendants' decision to discriminate against those mentally retarded clients whose families have the special love and capability to care for them at home is arbitrary and irrational. No legitimate factual distinction can be drawn between those at home and those in community residences with respect to the need for habilitation or the harm that will result from denial of services. Indeed, members of the two groups attend many of the same programs, sitting literally side by side. Members of both groups receive services that have been recommended by their professional interdisciplinary teams. Only those living at home are faced with the elimination of habilitative services. Although reducing services to one group while protecting the other was obviously more expedient, it was not rational.

The basic flaw in the method used to reduce spending was that it was done "top down." Decisions were made at the point most removed from the day to day delivery of services to each retarded person. The corollary to this technique is that no consideration was given to the actual impact that would result to each retarded individual. (Stip. ¶ 256; Sykes, N.T. 144–46, 9/26/88).

Although services are initiated and delivered according to individual needs, the budget cuts were determined in a manner that eschewed individual evaluation and relied instead upon gross and discriminatory generalizations.

The arbitrariness of the methods used by defendants was not limited to the initial decision to make cuts according to the residential/non-residential classifications. The means by which reductions were specified within individual non-residential service categories was arbitrary at best. No clinical or programmatic rationale based on individual needs was ever used to make the decisions. (Sykes, N.T. 137, 9/26/88). There was no administrative, fiscal, clinical or scientific basis for the budget reductions figures in each category; the officials instead "backed into" the numbers. (Sykes, N.T. pp. 133–37, 9/27/88). Once the numbers were backed into, moreover, no attempt was made to either test the validity of the cuts by examining the comparative impact of any alternative set of service reductions or to even "fine tune" the original numbers chosen. (Sykes, N.T. pp. 134–38, 9/26/88). The arbitrariness and lack of rationality of the discriminatory classifications was accordingly a reflection of the entire approach used to deal with the budget deficit. It was clearly arbitrary and not an exercise of rational judgment.

■ The Court is aware that the administration of a large social services program is not an easy task. Agencies plagued with recurrent deficits in the face of needs which must be routinely compromised are in a seemingly impossible situation. The need to reduce spending is not, however, a defense for arbitrarily cutting services to one group of retarded individuals rather than another, when the two groups are not distinguishable in a meaningful way as to their relative need for services. *Plyler v. Doe*, 457 U.S. 202, 229, 102 S.Ct. 2382, 2401, 72 L.Ed.2d 786 (1982). It is neither the right nor the duty of this Court to substitute its own judgment for that of the defendants. When, however, it appears that there has been a lack of judgment, or

an irrational lack of fairness, the Court must intercede.

The defendants have chosen the path of least resistance in extracting all of the savings from the non-residential programs. It is as if they seek to capitalize upon the love and dedication of the families of the class members. Those whose families have given the most, who have received the least in services and cost the least to habilitate are now called upon to sacrifice and lose all of their services. The bottom line is that if you are retarded and someone loves you enough to provide a home for you, your habilitative services will be terminated for the rest of the fiscal year whereas if you are institutionalized or in a community residence, you will continue to receive all of your services. Were there a rational basis for such a result, the loss would remain with the plaintiff class. But because the discriminatory scheme used by defendants is not rationally related to any legitimate governmental interest, the Constitution demands that defendants should have found a better way to resolve the problem.

▇ The plaintiff class asserts a claim of entitlement to the continued receipt of habilitative services. Habilitation may be defined as "that process of teaching and training a person the basic life skills, his basic ability to deal with the world like everyone else". Glenn, N.T. p. 77, 9/27/88. Habilitation is what allows a retarded person to reach his or her maximum development. It is well accepted that all retarded people can improve their skills with habilitation in a non-institutional environment. *E.g., Halderman v. Pennhurst State School & Hospital,* 446 F.Supp. 1295, 1298 (E.D.Pa.1977). Habilitation is more of a necessity to the mentally retarded than is education for the non-retarded. Although there is no fundamental right to receive education, *Kadrmas v. Dickinson Public Schools,* —— U.S. ——, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988), the United States Supreme Court has held that it is appropriate for a Court to determine whether the discriminatory denial of access to education by a state is violative of the Equal Protection Clause by requiring proof of a sub-stantial state interest. *Plyler v. Doe, supra.* As Justice Brennan stated in *Plyler,* "a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources," 457 U.S. at 227, 102 S.Ct. at 2400, nor may a state " 'reduce expenditures for education by barring [some arbitrarily chosen class of] children from its schools,' *Shapiro v. Thompson,* 394 U.S. 618, 633, 89 S.Ct. 1322, 1330 [22 L.Ed.2d 600] ... (1969)," 457 U.S. at 229, 102 S.Ct. at 2401. "If the state is to deny a discrete group ... education ... that denial must be justified by showing that it furthers some substantial state interest," 457 U.S. at 230; 102 S.Ct. at 2401–02. Although mental retardation may not be a suspect or "quasi-suspect" classification, discrimination against the retarded must be justified by more than a claim that it is rationally related to a legitimate government interest, *City of Cleburne v. Cleburne Living Center,* 473 U.S. at 451, 105 S.Ct. at 3260 (Stevens, J., concurring); 473 U.S. at 455, 105 S.Ct. at 3262 (Marshall, J., dissenting).

Central to the analysis of the *Plyler* court was the recognition of the essential function of education in a free society. As Justice Brennan wrote,

> [E]ducation provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society. We cannot ignore the significant social costs borne by our Nation when selected groups are denied the means to absorb the values and skills upon which our social order rests.... The inestimable toll of that deprivation on the social economic, intellectual, and psychological well-being of the individual, and the obstacle it poses to individual achievement, make it most difficult to reconcile the cost or the principle of a status-based denial of basic education with the framework of equality embodied in the Equal Protection Clause.

*Plyler,* 457 U.S. at 221–22, 102 S.Ct. 2397.

No group can make a more legitimate claim to the need for education than the

mentally retarded. Habilitation for the retarded permits them to be physically safe and free from restraints. *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). It allows them to leave an institution to live in the community. *Clark v. Cohen,* 794 F.2d 79 (3d Cir.1986) *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986). It is essential that they learn and maintain the most basic self care skills. It facilitates their being able to engage in competitive employment so that they may be productive members of society. It gives some retarded individuals the ability to speak, naturally or with the assistance of a computer synthesized voice, or to write, abilities which are essential to the exercise of free speech.

This record contains no evidence that the denial of services to the members of the plaintiff class furthers any substantial state interest. The evidence in this record demonstrates that the defendants simply determined that because of a projected fiscal deficit of $6.8 million in the budget for habilitative services to retarded individuals it would be appropriate for them to cut services to those living at home with their families, a determination which this Court has found to be arbitrary and irrational. The Court finds that the means by which defendants' eliminated services to the plaintiff class is prohibited by the Equal Protection Clause of the Fourteenth Amendment.

### DEPRIVATION OF SUBSTANTIVE DUE PROCESS RIGHTS

■ The irreparable injury which all parties agree will be suffered by each member of the plaintiff class is constitutionally cognizable under the Fourteenth Amendment. One's safety and well being are within the liberty interests protected by due process. *Youngberg v. Romeo,* 457 U.S. 307, 315–16, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982) (personal security and freedom from bodily restraint); *Balistreri v. Pacifica Police Dept.,* 855 F.2d 1421, 1425 (9th Cir.1988) (freedom from physical harm and restraint); *Estate of Gilmore v. Buckley,* 787 F.2d 714, 721 (1st Cir.1986) (safety and well being) *cert. denied,* 479 U.S. 882, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986). The regression

that will result from the proposed cutbacks will jeopardize the health and safety of each member of the class. Termination of habilitation to the retarded leads to such problems as agression, self abuse, resort to administration of psychotropic medications, and other forms of physical and emotional injury.

Failure to maintain the basic skills of the retarded implicates the rights of a retarded person to personal autonomy. In the context of habilitation provided by an institution, Justice Blackmun, joined by Justices Brennan and O'Connor, suggested that failure to provide adequate training to maintain self care skills may violate due process rights.

> If a person could demonstrate that he entered a state institution with minimal self-care skills, but lost those skills after commitment because of the State's unreasonable refusal to provide him training, then, it seems to me, he has alleged a loss of liberty quite distinct from—and as serious as—the loss of safety and freedom from unreasonable restraints. For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know.

*Youngberg,* 457 U.S. at 327, 102 S.Ct. at 2464 (Blackmun, J., concurring). Judge Becker of our Third Circuit, referring to Justice Blackmun's statement quoted above, analysed it as being grounded in the right to personal autonomy.

> Liberty is more than merely the absence of physical confinement; as the Supreme Court's privacy cases make clear, the right of liberty is a right to personal autonomy, ... The mentally disabled cannot have meaningful autonomy, and hence meaningful liberty, without basic skills; therefore, for the state to allow disabled persons' skills to deteriorate is as sure a denial of their liberty as is their confinement to an institution. It is indeed a sad fact that for many mentally disabled people self-care skills are "as much liberty as they ever will know." *Youngberg v. Romeo,* 457 U.S. at 327,

102 S.Ct. at 2464 (Blackmun, J., concurring). The right to habilitation would be a nullity if that right did not extend even to prevent the deterioration of people's skills.

*Clark v. Cohen,* 794 F.2d 79, 96 (3d Cir. 1986) (Becker, J., concurring) (citations omitted). These principles are not restricted in application to those retarded persons residing in institutions. The liberty interests identified in *Youngberg* involve rights which are cognizable in the absence of institutionalization. 457 U.S. at 315–316, 102 S.Ct. at 2458.

The evidence presented to the Court demonstrates that members of the class are threatened with gross deterioration of their basic skills if their habilitative services are eliminated. As noted earlier, the continuity of the training afforded to the mentally retarded is essential to avoid the loss of acquired skills. The capabilities which may be lost by members of the class when habilitation is terminated include the most basic self care skills such as toileting, dressing, eating and drinking, walking and talking. In addition, cessation of habilitative services to other members of the plaintiff class may deny many of them the opportunity to be productive members of society. Eighty-five percent of the mentally retarded eventually become employable. *Halderman v. Pennhurst State Sch. and Hospital,* 446 F.Supp. at 1312. The loss of employment opportunities has a devastating impact on a retarded person. Such a loss serves only to compound the other problems faced by the members of the plaintiff class.

Finally, there is a Constitutionally protected liberty interest in maintaining the integrity of the family unit, *Estate of Bailey v. County of York,* 768 F.2d 503, 509 f. 7 (3d Cir.1985), in the face of government conduct which will lead to undesired separation of children from their parents. "[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment," *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982), and "[t]he integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, ... the

Equal Protection Clause of the Fourteenth Amendment and the Ninth Amendment," *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972) (citations omitted). Included within the scope of this protection is the right of family members to reside together. *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion).

The services slated for termination by the defendants are necessary for the habilitation of the retarded who are living at home. Family support services are intended to provide assistance to the retarded person's family to enable the retarded person to remain at home. Moreover, it is most apparent that what distinguishes the families of the members of the plaintiff class from other families of the retarded is their dedication to the care of their own at home. Many of the members of the plaintiff class are mature adults. Their parents are, in many cases, elderly and/or in poor health. Without continued support in the form of direct habilitative services or family support services, it will be impossible for those members of the class to remain in the family home. (*E.g.,* Stip. ¶ 52; 145–47; 166, 169; 170–71). Although the need for emergency aid will increase if the proposed cuts are made, emergency services have also been cut. (Sykes, N.T. pp. 142, 152, 9/26/88).

██ Although it has been said that the defendants are under no constitutional duty to provide habilitative services to the mentally retarded, having provided habilitative services to the plaintiff class members, the defendants may not abandon them in a manner violative of the Fourteenth Amendment. The Fourteenth Amendment is viewed as "limit[ing] the actions the states can take rather than mandating specific obligations." *Wideman v. Shallowford Community Hosp., Inc.,* 826 F.2d 1030 (11th Cir.1987) (citation omitted).

Courts have recognized that an individual has a right to receive services if he or she has a "special relationship" with the

government. The failure to provide such services will result in a constitutionally cognizable loss, *e.g., Youngberg, supra; Stoneking v. Bradford Area Sch. District,* 856 F.2d 594 (3d Cir.1988); *Balistreri, supra; contra, DeShaney v. Winnebago County Department of Social Services,* 812 F.2d 298 (7th Cir.1987), *cert. granted,* — U.S. —, 108 S.Ct. 1218, 99 L.Ed.2d 419 (1988). After reviewing the cases, the First Circuit observed that

> [g]enerally speaking, all of these cases can be read for the proposition that, if the state takes a person into custody or otherwise assumes responsibility for that person's welfare, a "special relationship" may be created in respect of that person, and the fourteenth amendment imposes a concomitant duty on the state to assume some measure of responsibility for the person's safety and well-being.

*Estate of Gilmore,* 787 F.2d at 721. While there are divergent views among the circuits as to whether a custodial relationship is a necessary element of a special relationship, *Balistreri,* 855 F.2d at 1425, n. 4, our Third Circuit views custody as merely one of several factors to consider in determining whether a special relationship exists, *Bailey,* 768 F.2d at 509–11; *see also, Stoneking v. Bradford Area Sch. Dist.,* 856 F.2d at 599–601. The other factors to consider are whether the state expressly stated its desire to affirmatively protect a particular group and "whether the state knew of the victim's plight." *Bailey,* 768 F.2d at 509.

While the members of the plaintiff class are not in twenty four hour daily custody, neither can defendants claim that they are unaware that plaintiffs, "as distinguished from the public at large, face[ ] any special danger." *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980). To the contrary, as the defendants have admitted, they are well aware of the irreparable injury faced by each individual member of the class if habilitation services are terminated. The defendants have developed habilitation plans for each retarded individual in the class. The professionals employed by the defendants are aware of the irreparable injury which will occur if

the services are eliminated. The members of the plaintiff class are regularly in the physical care and custody of the defendants while participating in the various habilitative programs. Such custody of the dependent members of the plaintiff class provides a sufficient basis for this Court to find that a special relationship exists between them and the defendants.

The defendants are well aware that the members of the plaintiff class depend on them for their basic habilitative needs. They have no place else to go. It has been stipulated that those "whose services are subject to elimination under the challenged plan would each suffer injury, some of them serious injury, as a result of the elimination of services," (Fact Stipulation, ¶ 2) and that "the members of the plaintiff class each would suffer harm if an injunction is not granted." (Stip. ¶ 4).

■ Both the state and city are affirmatively mandated to provide services to the mentally retarded. The Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4101, et seq. ("MH/MR Act") is an express statement of the legislative intent that the state and city defendants are obligated to provide habilitative services to the retarded. As Judge Gibbons stated in *Halderman v. Pennhurst State School & Hospital,* 612 F.2d 84, 102 (1979) (en banc), *rev'd on other grounds,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), "[t]he MH/MR Act of 1966 contemplated a joint venture between the Commonwealth and its subdivisions, the counties, in the provision of services to the mentally handicapped." The Supreme Court of Pennsylvania has also held that the statute places an affirmative duty on both the state and the city together "to insure the availability of adequate mental retardation services for all of the residents of the states [sic] in need of such services." *In re Schmidt,* 494 Pa. 86, 429 A.2d 631, 635 (1981). The MH/MR Act makes abundantly clear the legislative intent that the defendants are mandated

> to assure within the State the availability and equitable provision of adequate mental health and mental retardation servic-

es for all persons who need them, regardless of religion, race, color, national origin, settlement, *residence,* or economic or social status.

50 P.S. § 4201(1) (emphasis added). In the face of this clear legislative mandate the defendants' are charged with the duty to provide adequate mental retardation services to the residents of Philadelphia, whether they live at home or elsewhere. The dependent relationship between plaintiffs, who are receiving habilitative services, and the city and state officials who are bound to provide such services "is an important one involving substantial duties and, therefore, substantial rights," *Taylor v. Ledbetter,* 818 F.2d 791, 798 (11th Cir.1987) (special relationship of dependent children and state and county foster child care program).

While it is thus clear that the members of the plaintiff class have shown that their liberty interests are infringed by the proposed service eliminations and that they have a colorable constitutional claim to maintenance of the services because of the special relationship between them and the defendants, their right to relief is predicated upon a weighing of their interests against those of the state.

> The question then is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint or lack of absolute safety is such as to violate due process.
>
> In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance "the liberty of the individual" and "the demands of an organized society." ... In seeking this balance in other cases, the Court has weighed the individual's interest in liberty against the State's asserted reasons for restraining individual liberty.

*Youngberg,* 457 U.S. at 320, 102 S.Ct. at 2460 (citations omitted). The *Youngberg* court then held that the determination of the correct balance between individual rights and state interests requires that a court defer to the judgment of a qualified, appropriate professional, whose decision is presumptively valid. 457 U.S. at 321–23; 102 S.Ct. at 2961–62. *Youngberg* cloaks the decision of the appropriate professional with presumptive validity so that a judge or jury will not be permitted to second guess his or her treatment decisions by selecting "which of several professionally acceptable choices shall have been made," 457 U.S. at 321, 102 S.Ct. at 2461. The judgment of the relevant professional is constitutionally infirm only if it is a "substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible did not base the decision on such a judgment." 457 U.S. at 323, 102 S.Ct. at 2462.

This Court heard testimony from several witnesses whose expertise in and dedication to the habilitation of the mentally retarded is beyond question. These witnesses were: the Deputy Secretary for Mental Retardation, Steven Eidelman; the MH/MR Administrator for Philadelphia, Dr. Glover; the Acting Director of Mental Retardation Services for Philadelphia, Ms. Sykes; and plaintiffs' expert witness, who is nationally recognized as an expert in mental retardation, Ms. Glenn. These professionals agreed that terminating habilitative services to the members of the class will result in irreparable injury to them. As heretofore pointed out, the parties stipulated that the members of the plaintiff class "would each suffer injury, some of them serious injury, as a result of the elimination of services." (Stip. ¶ 2)

 The decision by the defendants to terminate services to the class members was not based on the exercise of their professional judgments. Their decision did not take into consideration the individual needs of the class members. Individual levels of retardation and the presence or absence of other conditions were not considered, although the members of the class do vary from mildly to profoundly retarded. Each family of the members of the class is different in age, health, income and employment. Each member of the class receives a different mix of habilitative services. In short, the impact on each member of the class was not taken into account

when the service terminations were decided.

The decision made by the defendants was an administrative decision. It was not a decision made on the basis of their professional expertise in the field of retardation. "A 'professional judgment' based primarily on administrative convenience or the purely economic interest of the state does not pass muster." *Rennie v. Klein,* 720 F.2d 266, 276 (3d Cir.1983) (Weis, J., concurring). Proof of severe budgetary constraints, moreover, is not a defense without the establishment of a causal relationship between the funding problems and the specific treatment afforded to the individual, for "[a] professional judgment with respect to a mental patient obviously must take that patient's *individual* situation into account." *Scott v. Plante,* 691 F.2d 634, 637 (3d Cir.1982) (emphasis added). The substantive liberty interests set forth above are violated when treatment decisions are based upon administrative or fiscal concerns rather than the judgment of the professionals responsible for the treatment of individual clients. The Court finds therefore that the substantive due process rights of the members of the plaintiff class have been violated.

RELIEF

For all the above reasons, the Court finds that the elimination of habilitative services to the members of the plaintiff class violates their constitutional rights. It is clear therefore that the retarded members of the plaintiff class who are residing at home with their families are entitled to injunctive relief.

It should be noted that the injunctive relief being ordered is based upon our finding that the termination of habilitative services to the members of the plaintiff class is violative of rights guaranteed by the Fourteenth Amendment. Although the services are provided pursuant to the Pennsylvania MH/MR Act, the unconstitutionality of the termination of such services is not based on state law. The Court has found that the withdrawal of services which were being provided is unconstitutional, both because of the method used to determine which retarded individuals would be deprived of the services and because of the nature of the resulting injury to the members of the class. Accordingly, in granting injunctive relief in this matter, the Court is not bound by the majority decision in *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

▇▇▇ Injunctive relief is necessary in this case to prevent violations of the rights of the class members and not to redress past violations. The Eleventh Amendment does not prevent a federal court from enjoining constitutional violations. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Accordingly, an injunction shall issue barring the defendants from terminating habilitative services to members of the plaintiff class who reside at home.

This case, involving as it does the Constitutional rights of persons who are mentally retarded, highlights the necessity of articulating the constitutional rights of the retarded individuals who have been receiving habilitation while living at home. With the recent recognition by the professionals in the field of retardation that adequate habilitation cannot be achieved for the retarded in an institutional setting and that the concept of normalization requires that habilitation services to the retarded must be provided in a community setting, this court was faced with the task of determining the rights of the retarded in the community, pursuant to the Equal Protection and Due Process Clauses of the Fourteenth Amendment. This Court has determined that, under the factual circumstances herein set forth, the Constitution forbids the defendants from withdrawing their habilitative services from the mentally retarded who reside at home.

ORDER

AND NOW, this 17th day of November, 1988, for the reasons set forth in this Court's Memorandum of November 17, 1988, it is hereby ORDERED that injunctive relief is GRANTED as follows:

1. Each of the defendants, their agents, employees and those acting in concert with them, are enjoined from terminating habilitative services, including all programs, support services and transportation services to the retarded members of the plaintiff class who live in residences other than Community Living Arrangements and institutions and shall provide such services to the said class members on the same basis and to the same extent as were provided on June 1, 1988.

2. This injunctive order shall become effective at 12:01 a.m. Friday, November 18, 1988, and shall continue in full force and effect until otherwise ordered by this Court.