**PHILADELPHIA POLICE AND FIRE ASSOCIATION FOR HANDICAPPED CHILDREN, INC., et al.**

v.

**CITY OF PHILADELPHIA, et al.**

Civ. A. No. 88–5305.

United States District Court,
E.D. Pennsylvania.

Feb. 2, 1989.

David Ferleger, Philadelphia, Pa., for plaintiffs.

Richard J. Gold, Chief Deputy, Doris M. Leisch, City Solicitor's Office, Philadelphia, Pa., for City defendants.

Donald M. Donaldson, Sr., Deputy, Laura Fredricks, Deputy Atty. Gen., Philadelphia, Pa., for Commonwealth defendants.

MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

This action was instituted on July 7, 1988 against the City of Philadelphia, officials of the City Department of Health ("City defendants") and the Secretary and Deputy

Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania ("Commonwealth defendants") on behalf of a class consisting of mentally retarded residents of Philadelphia living at home. The members of the plaintiff class sought to enjoin the termination of habilitative services which they were receiving. Notices had been sent in June that the habilitative services would be terminated because of lack of funds. After a hearing, the Court on July 29, 1988 issued a temporary restraining order which enjoined the defendants to continue all habilitative services to the members of the plaintiff class "on the same basis and to the same extent as such services were provided as of June 1, 1988." By agreement of the parties, the trial on the merits was consolidated with the hearing on the request for a preliminary injunction and the matter was heard from September 26 through September 29, 1988. At the conclusion of the hearing, the Court, having found that all the parties were in agreement that the termination of habilitative services to the members of the plaintiff class would result in irreparable injury to the members of the class and cause serious regression to many of them, entered an Order on September 30, 1988 directing the parties to meet in Harrisburg in an effort to settle the litigation. The Court recommended that the parties invite the Governor of the Commonwealth of Pennsylvania and the Mayor of the City of Philadelphia to attend the meeting. For reasons never made clear to the Court, that meeting never took place.

In this Court's Memorandum of November 17, 1988, the Court found that the elimination of habilitative services by the defendants violated the Constitutional rights of the members of the plaintiff class and issued an Order enjoining the defendants from terminating habilitative services to the members of the plaintiff class and specifically ordered the defendants to provide the services "on the same basis and to the same effect as were provided on June 1, 1988." The Court found that the funding for the programs for the mentally retarded is totally dependent upon funds allocated to the City by the Commonwealth defendants. The Commonwealth defendants and the City defendants have been well aware, since early in 1988, that the funds allocated to the City for habilitative services to the mentally retarded were insufficient for the fiscal year. (July 1988 through June 1989). The Commonwealth defendants took the position then, as they do now, that the Commonwealth did not have the funds necessary to continue habilitative services to the members of the plaintiff class for the remainder of this fiscal year. The Court found that the City defendants had been contributing more than 10% of the funds and were ready and able to continue providing their 10% share of the funding. The Commonwealth defendants were aware then, as they are now, that the programs for the mentally retarded could not be maintained by the City of Philadelphia in the absence of sufficient funds being allocated to the City by the Commonwealth defendants. The Court found that it was the Commonwealth defendants, not the state legislature, who determined how much money the City would receive for services to the retarded, and when the Commonwealth defendants made their allocation to the City for the fiscal year commencing July 1, 1988, all defendants in this case were well aware that services to the retarded members of the plaintiff class would be terminated unless and until the Commonwealth defendants provided additional funding. As found by the Court, the City of Philadelphia ranks last among the counties in the percentage increase for funding for mental retardation. In this connection, it is of interest to note that on July 29, 1988 this Court in the case of *Halderman v. Pennhurst*, C.A. No. 74–1345 received a report by four experts whose appointment was agreed to by the Commonwealth and the City defendants. These four experts had been appointed to review and analyze the community service programs for the retarded in the City of Philadelphia. The team of experts reported "[i]n developing budget requests for ensuing fiscal years, the Commonwealth reportedly uses cost figures from the prior year which fail to reflect the current true cost of service. The resulting allocations

to Philadelphia in any given year were, consequently, inadequate to fund the existing base of programs." S. Gant, D. DiMichele, R. Melzer & W. Henderson, *Report of Expert Team on Services to Pennhurst Class Members in Philadelphia County* (July 1988) at 29. [hereinafter, Expert Report]. Had Philadelphia been allocated the average increase as compared to other counties in the Commonwealth, there would have been more than sufficient funds to continue the habilitative programs for the retarded who are living at home.

On December 16, 1988, the City defendants filed a motion requesting the Court to find the Commonwealth defendants in civil contempt on the ground that the Commonwealth defendants failed to provide any funds for the continuation of the services ordered by the Court. A contempt hearing was held on January 18, 1989. On the basis of the following findings of fact, the Court has determined that the Commonwealth defendants are in contempt:

The Commonwealth defendants have taken no action whatsoever in an effort to comply with the Court's Order of November 17, 1988.

The City defendants, acting alone, without additional funds from the Commonwealth, have succeeded in maintaining the services ordered by the Court. However, the City has now exhausted all funds allocated to it by the Commonwealth for services to the plaintiff class for the remainder of this fiscal year. The Commonwealth has been well aware that this would happen. Without the infusion of new funds by the Commonwealth, habilitative services to the members of the plaintiff class will terminate. The crisis now being faced by the retarded members of the plaintiff class living at home is the same crisis which initiated this litigation. The provision of habilitative services to the mentally retarded living at home with their families in Philadelphia is accomplished through a delivery system requiring the active participation of the Commonwealth defendants and the City defendants. The services which the members of the plaintiff class receive are actually delivered by various nonprofit agencies, known as providers, acting under contracts with the City. The Court finds that the system for delivery of nonresidential habilitative services by contract with provider agencies is in imminent danger of collapse. Some providers have continued to operate under their own deficits by borrowing money to maintain the services mandated by the Court's Order. (Glover, N.T. 25, 1/18/89). However, without additional funding from the Commonwealth defendants, providers will in the immediate future become financially unable to provide services to the members of the class. Furthermore, many persons employed by provider agencies have already departed to obtain more secure employment and few persons are applying for positions in what appears to them to be a financially unstable situation. (Glover, N.T. 25, 1/18/89).

█ The Court finds that the Commonwealth defendants have taken no action to allocate additional funding or obtain additional funds to finance the Court's Order. The Commonwealth defendants, in response to interrogatories inquiring as to the specific actions which they have "taken to comply with the Court's November 17, 1988 Order", replied that they have taken no action and that they plan to take no action to comply. The Commonwealth defendants' determination to take no action whatsoever to allocate or obtain additional funding in order to provide habilitative services to the members of the plaintiff class has been obvious since prior to the inception of this litigation last July. The record shows that neither Secretary White nor Deputy Secretary Eidelman have taken any action to allocate or secure additional funds for the retarded residents of Philadelphia (Eidelman, N.T. 73, 1/18/89). The Court finds that they did nothing to comply with this Court's Order of November 17th.

In response to an interrogatory directed to the Commonwealth defendants which asked, "[a]re there any other persons whose actions, in your opinion, are necessary for the relief granted in the November 17, 1988 order to be complete?", the Commonwealth defendants replied, "[t]he City defendants must shift resources now spent

or planned to be spent on non-Pennhurst class CLA residents in favor of the Police/Fire class (i.e., those living at home). This should be done immediately." This response by the Commonwealth defendants is one of the two proposals which the Commonwealth defendants made in open court for continuing services to the retarded. The elimination of all services to the retarded residing in Community Living Arrangements who are not members of the Pennhurst class would compound the crisis by inflicting irreparable injury to these residents.

The other proposal of the Commonwealth defendants for ensuring the continuation of services to the retarded living at home in Philadelphia is the suggestion that the City defendants should provide 100% of the funding. This proposal not only flies in the face of the mandate of the Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4101 et seq. ("MH/MR Act") regarding Commonwealth support of mental retardation programs, but it would clearly add to the deficit of the City of Philadelphia at a time when the Commonwealth is advertising a surplus. (Reveal, N.T. 59–61, 1/18/89; Eidelman, N.T. 86–87, 1/18/89).

As pointed out in this Court's Memorandum of November 17, 1988, the state and the city are affirmatively mandated to provide services to the mentally retarded. The MH/MR Act is an express statement of the legislative intent that the Commonwealth and City defendants are obligated to provide habilitative services to the retarded. As Judge (now Chief Judge) Gibbons stated in *Halderman v. Pennhurst State School & Hospital*, 612 F.2d 84, 102 (3rd Cir.1979) (en banc), *rev'd on other grounds*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), "[t]he MH/MR Act of 1966 contemplated a joint venture between the Commonwealth and its subdivisions, the counties, in the provision of services to the mentally handicapped." The Supreme Court of Pennsylvania has also made it abundantly clear, in an opinion written by Justice (now Chief Justice) Nix, that the statute places an affirmative duty on both the state and the city together "to insure the availability of adequate mental retardation services for

all of the residents of the states [sic] in need of such services." *In re Schmidt*, 494 Pa. 86, 429 A.2d 631, 635 (1981).

Section 201 of the MH/MR Act specifically mandates that the Commonwealth defendants "assure within the State the availability ... of adequate ... mental retardation services for all persons who need them ..." 50 P.S. § 4201(1). The Commonwealth defendants are obligated to allocate funding sufficient for mental retardation services to the counties. The same legislation mandates that Commonwealth defendants "consult with and assist each County in carrying out ... mental retardation duties and functions," 50 P.S. § 4201(3), and requires the Commonwealth defendants "[t]o make grants, pay subsidies, purchase services and provide reimbursement for ... mental retardation services," 50 P.S. § 4201(7). The statute also makes it clear that it is the obligation of Commonwealth defendants to "supervise ... mental retardation facilities, services and programs." 50 P.S. § 4201(8). The supervisory role of the Commonwealth defendants includes the allocation of funds to each county program and the review and approval or disapproval of each county's annual plan for providing retardation services.

Against this legislative background of well defined duties and obligations, the Court finds it totally unrealistic that the Commonwealth defendants take the position that the Commonwealth is not obligated to allocate or obtain the funds necessary to carry out this Court's Order of November 17. The Court specifically ordered the Commonwealth defendants to provide habilitative services to the members of the plaintiff class. The above quoted legislation makes it clear that the Commonwealth is obligated to provide 90% of the funding for habilitative services to the retarded pursuant to programs which the Commonwealth defendants approved and programs which they are mandated to supervise. 50 P.S. § 4509(1).

The Commonwealth defendants are mandated by law to require the counties, including Philadelphia, to provide annual

plans and annual estimates of expenditures for mental retardation programs, 50 P.S. § 4509(2), and "[t]o review grants against actual expenditures at any time and to make appropriate adjustments in subsequent grants," 50 P.S. § 4509(6). There is no question that the Commonwealth defendants are required by the legislation to allocate funds to the counties, including Philadelphia, for the purpose of providing habilitative services pursuant to plans which they have approved and which they are directed to supervise.

The Commonwealth defendants do not take issue with the City defendants that the deficit in funding for services to the retarded at the present time is approximately $5.5 million (Eidelman, N.T. 85, 1/18/89). It appears, however, that the Commonwealth defendants believe that the City defendants are not providing fiscally sound administration of the funds for the mentally retarded. They point out, for instance, that the costs of the habilitative services for the retarded are higher in Philadelphia than anywhere else in the Commonwealth. In this connection, it is of interest to note that the hereinabove referred to Expert Report submitted in *Halderman v. Pennhurst,* C.A. No. 74–1345 states:

> The pattern of interactions between the Commonwealth, the County and providers is often dysfunctional, rarely coordinated and generally characterized by a complete lack of trust. If anything occurs as the outcome of planning, stratetic or otherwise, the link is not evident. As a result, considerable amounts of money are being expended without an apparent relationship to the quality or quantity of services rendered; volumes of information are collected about class members but little exists in the way of a mechanism to effectively use the date for corrective action; and, virtually everyone has resorted to some form of brinkmanship as a means of conflict resolution. (pp. 9–10).

> \* \* \* \* \* \*

From the County's perspective, the problem was simply attributed to inadequate funding from the Commonwealth; while the State's position was that Philadelphia spent too much on services, especially in comparison to other counties. The providers, no doubt, felt caught in the cross fire between these bureaucracies and saw themselves and their clients as the ultimate victims. (p. 27).

It may well be that the Commonwealth defendants' refusal to come forward with the urgently needed additional funding was motivated by a laudatory determination to obtain more efficient use of allocated funds. The use of a method, however, which caused foreseeable irreparable injury to the innocent members of the plaintiff class, violating their Constitutional rights, is far from laudatory.

■ The Commonwealth defendants contend that the Court lacks the power to require them to provide the mandated funding on the basis of the holding in *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed. 2d 67 (1984) (5–4 decision). Although the majority opinion in *Pennhurst* determined that the Eleventh Amendment prohibited a federal court from ordering state officials to obey state law, Justice Powell, who wrote the majority opinion, made it abundantly clear that in an action against state officials where the Court has found that the state officials violated the United States Constitution, the federal court has the power to order prospective relief where the relief being ordered is necessary to prevent continuing violations of federal Constitutional rights. In this action wherein the Commonwealth defendants have been found to have violated the federal Constitutional rights of the members of the plaintiff class, this Court had the power to issue its injunction enjoining the termination of the habilitative services and ordering the Commonwealth defendants to allocate to the City of Philadelphia such funds as are necessary for the continuation of the services. Furthermore, even though a party disagrees with a Court's injunction, it must be obeyed unless and until a stay is granted pending appeal, *Maness v. Meyers,* 419 U.S. 449, 458, 95 S.Ct. 584, 591, 42

L.Ed.2d 574 (1975) or the injunction is vacated or withdrawn, *W.R. Grace and Co. v. Local Union 759,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183–84, 76 L.Ed.2d 298 (1983).

This Court having found that the Commonwealth defendants in the course of their duties as authorized representatives of the Commonwealth of Pennsylvania are in contempt of the November 17, 1988 Order will order the Commonwealth defendants to pay fines in the amount of $15,000 per day for every day the Commonwealth defendants fail to pay to the City of Philadelphia the amounts set forth in the Court's Order on or before the dates specified therein. The Court finds that the amounts set forth in its Order are necessary for providing habilitative services to the members of the plaintiff class for the remainder of the fiscal year (July 1, 1988 to June 30, 1989). As heretofore pointed out, there is no dispute between the parties as to the amount of the deficit in funding for mental retardation services for the members of the plaintiff class in Philadelphia. It is currently projected to be $5,486,000. The Court finds that this sum is necessary to fully comply with the November 17 Order. The City defendants have stated their willingness and ability to provide 10% of this sum, $548,600. Therefore, the balance required from the Commonwealth is $4,937,400. The Commonwealth will be ordered to make a payment of three quarters of the amount due, $3,703,050, on or before February 14, 1989, with the balance of $1,234,350 due, to be paid on or before April 1, 1989. Each of the payments shall be in addition to and not in lieu of funds previously allocated to the City by the Commonwealth defendants for habilitative services to the retarded residents of Philadelphia.

## ORDER

AND NOW, this 2nd day of February, 1989, for the reasons set forth in this Court's Memorandum of February 2nd, 1989, the Court having found that in the course of their duties as authorized representatives of the Commonwealth of Pennsylvania, the Honorable John White, Jr., Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania, and Steven Eidelman, Deputy DPW Secretary, are in contempt of this Court's Order of November 17, 1988;

IT IS ORDERED: On or before February 14, 1989, the Honorable John White, Jr., Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania and Steven Eidelman, Deputy DPW Secretary shall cause to be paid funds of the Commonwealth of Pennsylvania in the amount of $3,703,050 to the City of Philadelphia, Department of Health, Office of Mental Health and Mental Retardation, which sum shall be used solely for providing habilitative services to the members of the plaintiff class.

IT IS FURTHER ORDERED: On or before April 1, 1989, the Honorable John White, Jr., Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania and Steven Eidelman, Deputy DPW Secretary shall cause to be paid funds of the Commonwealth of Pennsylvania in the amount of $1,234,350 to the City of Philadelphia, Department of Health, Office of Mental Health and Mental Retardation which sum shall be used solely for providing habilitative services to the members of the plaintiff class.

IT IS FURTHER ORDERED: The payments of Commonwealth funds hereinbefore ordered to be paid in the amount of $3,703,050 on or before February 14, 1989, and in the amount of $1,234,350 on or before April 1, 1989, are in addition to Commonwealth funds heretofore allocated by the Department of Public Welfare of the Commonwealth of Pennsylvania to the City of Philadelphia, Department of Health, Office of Mental Health and Mental Retardation for the provision of habilitative services to the mentally retarded for the fiscal year July 1, 1988 through June 30, 1989.

IT IS FURTHER ORDERED: In the event that funds of the Commonwealth of Pennsylvania in the amount of $3,703,050 are not paid to the City of Philadelphia on or before February 14, 1989, the Honorable John White, Jr., Secretary of the Department of Public Welfare of the Common-

wealth of Pennsylvania and Steven Eidelman, Deputy DPW Secretary shall pay into the Registry of this Court civil fines totalling $15,000 per day for each day after February 14, 1989 that payment has not been made in accordance with the terms of this Order and, further, in the event that funds of the Commonwealth of Pennsylvania in the amount of $1,234,350 are not paid to the City of Philadelphia on or before April 1, 1989, the Honorable John White, Jr., Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania and Steven Eidelman, Deputy DPW Secretary shall pay into the Registry of this Court civil fines in the amount of $15,000 per day for each day after April 1, 1989 that payment has not been made in accordance with the terms of this Order, said fines to be in addition to the fines imposed for failure to make the February 14, 1989 payment.