874 F.2d 156
 57 USLW 2682
 PHILADELPHIA POLICE AND FIRE ASSOCIATION FOR HANDICAPPED
CHILDREN, INC., Phillip Joseph Barrett, Debbie Callaghan,
Gina Marie Coccia, Colleen Devaney, Bernadine Doughty,
William Engle, David Joseph Fialkowski, Thomas Edward Foley,
Robert G. Fulmer, Dianne Gradel, Suzanne Gress, Matthew T.
Hoag, Anthony T. Hulem, Elliot N. Jaffee, William J. Jaffee,
Edward Kelly, David Andrew Kensil, Yanina Kopyt, Helen
Posusney, Michael V. Powell, Loretto Ricciardi, David W.
Rickolds, David E. Rounds, Dennis Rowan, Diane Rubis,
Dorothy Schaeffler, Joseph R. Steffen, Elizabeth Sturkey,
Dennis P. Torrieri, William Watson, Judith Weick, Michael
Weinberg, on behalf of themselves and all others similarly situated
v.
CITY OF PHILADELPHIA, Maurice Clifford, Robert Glover, John
White, Jr., Steven Eidelman.
Appeal of CITY OF PHILADELPHIA, Maurice Clifford, and Robert
Glover, Appellants in No. 88-1883.
Appeal of COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF PUBLIC
WELFARE, Secretary and Deputy Secretary,
Appellants in Nos. 88-1909 and 89-1116.
 Nos. 88-1883, 88-1909 and 89-1116.
 United States Court of Appeals,
Third Circuit.
 Argued March 28, 1989.
Decided May 8, 1989.
Rehearing Denied June 8, 1989.
 
 Seymour Kurland, City Sol., Richard J. Gold (argued), First Deputy City Sol., Doris M. Leisch, Chief Asst. City Sol., City of Philadelphia Law Dept., Philadelphia, Pa., for City of Philadelphia etc., appellants in No. 88-1883.
 Ernest D. Preate, Jr., Atty. Gen., David M. Donaldson, (argued), Sr. Deputy Atty. Gen., Laura Fredricks, Deputy Atty. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Philadelphia, Pa., for Com. of Pa., Dept. of Public Welfare Secretary, and Deputy Secretary, appellants in Nos. 88-1909 and 89-1116.
 David Ferleger (argued), Philadelphia, Pa., for Philadelphia Police and Fire Ass'n for Handicapped Children, etc., appellees.
 Macdonald Flinn, Robert S. Herbst, White & Case, New York City, amici curiae, for The Ass'n for Retarted Citizens etc.
 Robert J. Sugarman, Sugarman & Cohen, Philadelphia, Pa., amicus curiae, for Philadephia Coalition of Community Mental Health/Mental Retardation Centers, Inc.
 Before GIBBONS, Chief Judge, and BECKER and NYGAARD, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Chief Judge:
 
 
 1
 The City of Philadelphia and its mental retardation officials, Health Commissioner Maurice Clifford and Mental Health/Mental Retardation Administrator Robert Glover, (collectively "Philadelphia"), and the Commonwealth of Pennsylvania, its Secretary of Public Welfare, John F. White, Jr., and his Deputy Secretary for Retardation, Steven Eidelman, (collectively "the Commonwealth") appeal from a district court order enjoining them to maintain services to mentally retarded individuals who live at home at fiscal year 1988 levels. We conclude that the district court erred in holding that the reduction or elimination of services to this group violated the fourteenth amendment on equal protection and substantive due process grounds. Therefore, we will reverse.
 
 I.
 
 2
 The mentally retarded require special and continuing care called "habilitation" to function optimally in society. Habilitation entails "teaching and training the retarded basic life and social skills," App. 833, such as walking, talking, eating, toileting, socializing, using money, traveling, and working. These lessons, however, are not learned permanently by mentally retarded persons: once habilitation ceases, they begin to regress. In Pennsylvania, state-subsidized habilitation of the mentally retarded is performed in a variety of settings ranging from state institutions to the retarded person's home.
 
 
 3
 Provision of these services is governed by the Mental Health and Mental Retardation Act of 1966, 50 Pa.Stat.Ann. Secs. 4101-4704 (Purdon 1969 & Supp.1988). The Act divides responsibility for providing and purchasing services for the mentally retarded between the state and county governments.[1] It delegates to the state the duties "[t]o ensure ... the availability and equitable provision of adequate ... mental retardation services for all persons who need them," to promulgate regulations consistent with the Act, and to assist the counties in fulfilling their duties. 50 Pa.Cons.Stat.Ann. Sec. 4201. It delegates to the counties diagnosis, evaluation of needs, and development of a plan to address those needs, including a determination to place the mentally retarded person either in the institution, a group home, or with his family. Id. at Secs. 4301-4305; 55 Pa.Code Secs. 6201.1-.14. To be eligible for county-level services, individuals must register with, and be accepted by, a base service unit ("BSU"). 50 Pa.Cons.Stat.Ann. Sec. 4301(d)(9) (Purdon 1969); 55 Pa.Code Sec. 6201.13(a).
 
 
 4
 The Act requires the Pennsylvania General Assembly annually to budget funds for mental retardation services within the state. See 50 Pa.Stat.Ann. Secs. 4201, 4202 (Purdon 1969 & Supp.1988). It delegates to the Department of Public Welfare disbursement of these funds, supplemented by federal funds, among Pennsylvania's sixty-seven counties. Id. at Secs. 4201, 4507, 4509. The counties, however, remain free to provide additional funding. See id. at Sec. 4509. The Act also anticipates funding shortfalls, requiring the Department of Public Welfare, in the event of an allocation insufficient to fully fund approved grants,
 
 
 5
 to distribute State funds among the counties by a formula reasonably designed to achieve the objectives of this act, provided however, that in such event the counties' financial obligations under this act shall be reduced in accordance with the same formula and the counties shall be required to provide only those services for which sufficient funds are available.
 
 
 6
 Id. at Sec. 4509(5).
 
 
 7
 Under the statutory scheme, the state must provide total funding for approved local residential programs, which give twenty-four hour care to live-in residents. Id. at Secs. 4507, 4509. Programs administering approved nonresidential services must receive ninety percent of their funding from the state and ten percent from the county. Id. at Sec. 4509. Since 1983, Philadelphia's program has run at a deficit; in each year through fiscal year 1987, it covered the deficit with money left over from placement of persons from Pennhurst. App. 636-37. In fiscal year 1988, however, Philadelphia could not find a way to cover the difference. Faced with cutting services, Philadelphia asked for and received supplemental funding from the Commonwealth. The Commonwealth, however, refused Philadelphia's request to annualize this special allocation. The Commonwealth's position set the stage for the instant dispute.
 
 
 8
 For fiscal year 1989, the Commonwealth once again allocated less funds than Philadelphia needed. The shortfall was estimated at $6.8 million, approximately 10% of Philadelphia's budgeted spending for care and treatment of the mentally retarded. The Commonwealth, as promised, refused to supplement the funding. In response, Philadelphia announced that it planned to reduce services to mentally retarded citizens living at home. The reductions would be made there because Philadelphia believed such a response best would maintain the integrity of the system as a whole.
 
 
 9
 Hoping to minimize harm to those residing at home, the city decided to cut "soft" services, such as case management, more heavily than "hard" services, such as day and vocational programs. Specifically, Philadelphia planned to compensate for the shortfall by reducing case management by 50%, family support services by 30%, and early intervention programs[2] by 10%. These cuts were made equally to each BSU. Thus, regardless of the ratio of nonresidential to residential clients serviced, each BSU lost the same proportionate amount of dollars. App. 214. The plan additionally called for a per person reduction in day and vocational programs, meaning that the ratio of nonresidential to residential clients factored into the reductions. Id. at 214-15. Once instituted, this policy would affect the home-treated mentally retarded as follows: 540 (59%) would lose their vocational services; 550 of 1,800 families would lose support services; and 150 of 1,500 children would lose their early intervention services. App. 829 (Philadelphia Police & Fire Ass'n for Handicapped Children v. City of Philadelphia, 699 F.Supp. 1106, 1107 (E.D.Pa.1988) [hereinafter Dist.Ct.Op. ]. The decision where to make the cuts was an administrative one.
 
 
 10
 When Philadelphia announced the planned cuts, the Philadelphia Police and Fire Association for Handicapped Children, Inc.[3] and thirty-two mentally retarded individuals, later absorbed into a certified class of mentally retarded plaintiffs comprised of all individuals currently or subsequently registered "as clients with retardation with the City of Philadelphia and its Base Services Units," (collectively, "the class"), sued Philadelphia and the Commonwealth under 42 U.S.C. Sec. 1983. September 15, 1988 Order, App. 170a. They alleged violations of the class members' fourteenth amendment equal protection and substantive due process rights arising from a reduction of mental retardation services provided to mentally retarded persons living at home by the state and the city due to budgetary shortages. They also alleged that Philadelphia's planned actions violated state law.
 
 
 11
 The class moved for a temporary restraining order and a preliminary injunction. On July 29, 1988, the district court heard oral argument and issued a temporary restraining order enjoining Philadelphia and the Commonwealth "to continue all services, programs and support ... to all retarded persons who were receiving such services on June 1, 1988 on the same basis and to the same extent as such services were provided as of June 1, 1988," effective 12:01 a.m. August 1, 1988. App. 167a. The court next consolidated the requests for preliminary and permanent injunctions and scheduled a trial for September 26, 1988. All issues concerning mentally retarded Philadelphians on the "waiting list" for services were severed, leaving for resolution at trial only those issues concerning the plaintiffs currently receiving community mental retardation services. The parties, through a series of agreements, consented to continue the temporary restraining order in effect through November 17, 1988.
 
 
 12
 The trial was held from September 26 through September 29, after which the court ordered the parties to attempt settlement. The negotiations, however, bore no fruit. Additional argument was heard on November 7.
 
 
 13
 Finally, on November 18, 1988, the district court filed a memorandum and order permanently enjoining Philadelphia and the Commonwealth "from terminating habilitative services, including all programs, support services and transportation services to the retarded members of the plaintiff class who live in residences other than Community Living Arrangements and institutions." App. 861. As under the temporary restraining order, Philadelphia and the Commonwealth were to provide services to each class member identical to those they were receiving on June 1, 1988. App. 861. The court based this order on the conclusion that the proposed reductions in community mental retardation services violated the class members' equal protection and substantive due process rights under the fourteenth amendment. The court did not address the class' state law claims against Philadelphia.
 
 
 14
 Philadelphia and the Commonwealth appealed. Shortly thereafter, Philadelphia moved for a stay pending appeal or, in the alternative, for a finding of civil contempt against the Commonwealth. After a January 18, 1989 hearing, the district court granted the alternative motion and ordered the Commonwealth to pay Philadelphia approximately $3.7 million by February 14 and $1.2 million by April 1. Supp.App. 882-83. The order specifies fines to be imposed should the Commonwealth miss either deadline. 705 F.Supp. 1103.
 
 
 15
 The Commonwealth appealed. It also sought and was denied, both by the district court and by this court, a stay pending appeal. As a result, Pennsylvania made its first payment on February 14 and announced that it would make the second payment as well. This court consolidated the three appeals and entertained them on an expedited basis. We have jurisdiction over the appeals of both orders under 28 U.S.C. Sec. 1292(a)(1), which, in part, gives jurisdiction over interlocutory grants of injunctions. See Cohen v. Board of Trustees of the Univ. of Medicine and Dentistry of New Jersey, 867 F.2d 1455, 1466 (3d Cir.1989) (in banc).
 
 II.
 
 16
 As a threshold position, the class asserts that the Commonwealth and Philadelphia have complied fully with the court's first injunction by funding and providing the services for fiscal year 1989, and that such compliance has rendered this appeal moot, depriving this court of subject matter jurisdiction to hear it. We disagree. "A case may become moot if (1) the alleged violation has ceased, and there is no reasonable expectation that it will recur, and (2) interim relief or events have 'completely and irrevocably eradicated the effects of the alleged violation.' " Finberg v. Sullivan, 658 F.2d 93, 97-98 (3d Cir.1980) (in banc) (footnote omitted) (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979)); accord New Jersey Turnpike Auth. v. Jersey Central Power, 772 F.2d 25, 31 (3d Cir.1985) (quoting Finberg ). Full compliance with an injunction amounting to the entirety of the relief sought renders an issue moot. See, e.g., Honig v. Students of Cal. School for the Blind, 471 U.S. 148, 105 S.Ct. 1820, 85 L.Ed.2d 114 (1985); DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (per curiam). But here, neither Philadelphia nor the Commonwealth has fully complied with the terms of the first injunction.
 
 
 17
 The class argues that the Commonwealth and Philadelphia's provision of services for fiscal year 1989 constitutes full compliance with the injunction because the trial involved only fiscal year 1989, and thus the injunction only orders the provision of services for that fiscal year. The language of the district court's order, however, does not limit the effect of the injunction to fiscal year 1989. The terms of the injunction obligate the defendants to continue to provide services to the mentally retarded at June 1988 levels "until otherwise ordered by the Court." Thus, on its face, the injunction continues in effect beyond fiscal year 1989, and the appeals with respect to it are not moot.
 
 
 18
 The peculiar nature of this claim also provides another ground for subject matter jurisdiction over the appeals from the first injunction. Courts may entertain cases where the controversy in question is moot if the issue is one " 'capable of repetition, yet evading review.' " DeFunis, 416 U.S. at 318-19, 94 S.Ct. at 1707 (quoting Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973)); accord Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975). Under Pennsylvania law, the state allocates funding for care of the mentally retarded on a yearly basis. The class argues that the unusual confluence of events that gave rise to this litigation is unlikely to occur again, placing particular reliance on the proof they introduced at trial. We disagree.
 
 
 19
 Philadelphia has operated its mental retardation system at a deficit for the past seven years. App. 296, 628-29, 636. During fiscal year 1988, the Commonwealth granted Philadelphia's request for supplemental funds to bail out the city under identical circumstances. App. 835. Because of the one-year duration of the allocations, it is unlikely that the Commonwealth ever could obtain a determination on the merits before the issue became moot. To turn away this appeal on mootness grounds would amount to institutionalizing Philadelphia's right to exceed with impunity state-approved spending limits. In addition, the facts presented make it likely that the same plaintiffs could be injured similarly in future years. See Weinstein, 423 U.S. at 149, 96 S.Ct. at 349 (traditionally, to avoid mootness, challenged conduct must be so short as to end before any opposition to it can be litigated fully, and "a reasonable expectation that the same complaining party would be subjected to the same action again" must exist).
 
 
 20
 The district court's contempt order, however, is a different matter. That order required the Commonwealth to make two payments--one on February 14, 1988, and one on April 1, 1988. Both of those payments apparently have been made, and the Commonwealth cannot recoup the money. We therefore will dismiss as moot the appeal with respect to the contempt order and vacate that order.
 
 III.
 
 21
 Having passed over the class' jurisdictional threshold, we must address the merits of the appeals from the first injunction. The Commonwealth and Philadelphia challenge the correctness of the district court's conclusion that the cutbacks draw an arbitrary and irrational distinction between those mentally retarded placed at home and those assigned to group homes. In contrast, the Commonwealth argues that the mentally retarded placed at home constitute a distinct group and, therefore, that the equal protection clause does not come into play. While this contention at best is debatable, we need not address it because the actions planned by Philadelphia and the Commonwealth survive minimum scrutiny, the appropriate test here. Thus, the district court erred in determining that the cutbacks were not executed in a rational way to address a legitimate governmental interest.
 
 A.
 
 22
 The fourteenth amendment provides in part that "[n]o State shall ... deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV. Jurisprudence on the equal protection clause recognizes that the act of governing often requires a state to bestow a benefit on some, but not all, of its citizens. See, e.g., Western & S. Life Ins. Co. v. State Bd. of Equalization, 451 U.S. 648, 656-57, 101 S.Ct. 2070, 2077, 68 L.Ed.2d 514 (1981) (fourteenth amendment does not prevent states from making reasonable classifications); Vance v. Bradley, 440 U.S. 93, 96-97, 99 S.Ct. 939, 942-43, 59 L.Ed.2d 171 (1979) (presumption exists in favor of legislatively-made classification if it does not affect a fundamental right or suspect group); Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (" 'The problems of government are practical ones and may justify, if they do not require, rough accommodations--illogical, it may be, and unscientific.' " (quoting Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69-70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913))). Thus, it is classification-oriented: at a base level, it permits the state to draw distinctions between groups of similarly situated individuals provided that the distinction is rationally drawn to address a legitimate purpose. E.g., Western & S. Life Ins. Co., 451 U.S. at 656-57, 101 S.Ct. at 2076-77; Vance v. Bradley, 440 U.S. at 96-97, 99 S.Ct. at 942-43.
 
 
 23
 Historically, certain classifications have proven suspect or quasi-suspect because they almost always serve no legitimate governmental purpose or because they impact a group traditionally politically unable to protect itself. See Plyler v. Doe, 457 U.S. 202, 216-17 & n. 14, 102 S.Ct. 2382, 2394-95 & n. 14, 72 L.Ed.2d 786 (1982). Such classifications signal courts asked to review legislation employing them to apply strict or heightened scrutiny to such laws. Id. These suspect or quasi-suspect classifications, however, represent a very limited exception to the general rule. In Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Supreme Court held that the classification of mentally retarded does not count among them. Thus, this equal protection claim requires minimal scrutiny.
 
 
 24
 Under minimal scrutiny, to determine whether state action violates the fourteenth amendment's equal protection clause, courts must ask whether the state rationally could have believed that the distinction drawn would promote a legitimate government objective. Western & S. Life Ins. Co., 451 U.S. at 656-57, 671-72, 101 S.Ct. at 2076-77, 2084-85. The Supreme Court has acknowledged the existence of a presumption in favor of the state's action in cases involving "social or economic legislation." E.g., Kadrmas v. Dickinson Public Schools, --- U.S. ----, 108 S.Ct. 2481, 2489, 101 L.Ed.2d 399 (1988); Bowen v. Gilliard, 483 U.S. 587, ---, 107 S.Ct. 3008, 3016, 97 L.Ed.2d 485 (1987); Cleburne, 473 U.S. at 440, 105 S.Ct. at 3254; City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); Dandridge v. Williams, 397 U.S. 471, 485-86, 90 S.Ct. 1153, 1161-62, 25 L.Ed.2d 491 (1970). This presumption imposes upon plaintiffs the heavy burden of making a "clear showing of arbitrariness and irrationality" in order to upset the legislation. Hodel v. Indiana, 452 U.S. 314, 331-32, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981); accord Kadrmas, 108 S.Ct. at 2489. Within this context, a statutory classification violates the equal protection clause "only if the statute's classification 'rests on grounds wholly irrelevant to the achievement of the State's objective.' " Kadrmas, 108 S.Ct. at 2489 (quoting Holt Civic Club v. Tuscaloosa, 439 U.S. 60, 71, 99 S.Ct. 383, 390, 58 L.Ed.2d 292 (1978) (quoting McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961))). The fact that the state action was rendered administratively does not invoke intensified scrutiny. See, e.g., New York City Transit Auth. v. Beazer, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979) (applying minimum scrutiny to agency decision); McCullough v. Redevelopment Auth., 522 F.2d 858, 874-77 (3d Cir.1975) (same). In the instant case, the district court overstepped these bounds when it held the cutbacks arbitrary and irrational.
 
 
 25
 Given the shortage of funds allocated to it by the Commonwealth, Philadelphia had to reduce its spending. Philadelphia's plan began with the notion that services for those residing in group homes needed to be maintained at its current level. It so concluded because those living in group homes are totally dependent on Philadelphia and the Commonwealth for their care and thus are more likely to require institutionalization should their services be diminished.[4] Minimizing institutionalization clearly is a legitimate state interest. Furthermore, Philadelphia offered testimony to show that a cut in day services to residential clients would not trim the deficit because it would require an equal additional expenditure for day staff at the residential facilities, a service not necessary when full day services are in place. App. 385-86. Thus, it cannot be said that Philadelphia's decision to limit cuts to those mentally retarded receiving services at home is "wholly irrelevant to the achievement of the State's objective" of reducing expenditures with minimal disruption to the system.
 
 
 26
 Nonetheless, the class counters that Philadelphia's argument would be persuasive only if had shown that distributing the cut of habilitative services to both those who live at home and those who live in the group residences would cause the closure of some residences, because only in that case would institutionalization of group home clients be necessary. This argument fails for two reasons. First, its premise is not necessarily true. Philadelphia could have believed that residents who lost habilitative services and therefore regressed would be more likely to be institutionalized than their counterparts who live with their families. The families, which already have demonstrated their devotion to their retarded children by caring for them at home, might be willing to keep them at home after they have regressed. In contrast, the residences might not be able to continue to care for such residents who, because of their regression, place greater demands on the residential staff. The district court characterized the situation as follows: "[I]t is as if [Philadelphia and the Commonwealth] seek to capitalize upon the love and dedication of the families of the class members." Dist.Ct.Op. at 1113, App. 844. Whatever our individual beliefs about the desirability of such a policy may be, such reliance on family dedication is not irrational because it may serve to minimize institutionalization.
 
 
 27
 Second, even if the premise of the class' argument were true, our ability to review Philadelphia's decision is limited. Under minimum scrutiny, we must uphold Philadelphia's actions if it reasonably could have thought that residences might have to be closed. The class bears the burden of showing otherwise. The $6.8 million budget shortfall represented 10% of Philadelphia's total budget for services to the retarded, and the plaintiffs have not shown that it was clear that such drastic cuts could be apportioned to those living in group residences without causing a shutdown of any of those residences.
 
 
 28
 The class also attacks Philadelphia's methodology in making the cuts as arbitrary. Philadelphia tried to structure the cuts in such a way as to minimize their impact on those mentally retarded living at home. The city targeted soft services for the heaviest cuts, trimming smaller amounts from hard services. The district court faulted this "top-down" method, which reduced types of spending, rather than cutting services on an individual basis determined by need, as irrational and arbitrary. It held that the situation required Philadelphia to have examined at the individual level the effects varying cutbacks would have. Furthermore, it faulted the lack of any "administrative, fiscal, clinical or scientific basis for the budget reduction figures in each category; the officials instead 'backed into' the numbers." App. 843.
 
 
 29
 The equal protection clause, however, tolerates some unfairness and mathematical imprecision. See, e.g., Mathews v. DeCastro, 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976); Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970); Price v. Cohen, 715 F.2d 87, 94 (3d Cir.1983), cert. denied, 465 U.S. 1032, 104 S.Ct. 1300, 79 L.Ed.2d 700 (1984); McCullough v. Redevelopment Auth., 522 F.2d 858, 876 (3d Cir.1975). Indeed, "[w]e may not compel the state to verify its logical assumptions with statistical evidence." Price, 715 F.2d at 95 (upholding welfare cuts to a class of needy individuals, even though they were made without individual determinations, clearly were overbroad, and were based on generalizations). Nor may the court hold legislation in violation of the clause just because it believes a better solution exists. New York City Transit Auth. v. Beazer, 440 U.S. 568, 594, 99 S.Ct. 1355, 1370, 59 L.Ed.2d 587 (1979); Dandridge, 397 U.S. at 485, 90 S.Ct. at 1161. It may be the case that Philadelphia made the wrong decision. It costs the city less to have the plaintiffs continue to live at home then it would cost if they needed to be housed in state-sponsored residences, and there is evidence in the record that without the services in question at least some of the plaintiffs no longer will be able to remain at home. See, e.g., App. 182, 329. But this is the type of policy judgment that we are not allowed to impose under rational basis scrutiny. See Beazer, 440 U.S. at 594, 99 S.Ct. at 1370; Dandridge, 397 U.S. at 485, 90 S.Ct. at 1161. Under the standard set out above, we hold that the state rationally could have believed that the classification would promote its legitimate interest in maintaining the integrity of its mental retardation services program; singling out those living at home is not "wholly irrelevant" to this goal.
 
 B.
 
 30
 The district court held alternatively that intermediate scrutiny should apply because the cut of habilitative services could be analogized to the denial of access to education. The district court read the Supreme Court's opinion in Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), as requiring heightened scrutiny for cases involving the denial of access to education and found that "[h]abilitation is more of a necessity to the mentally retarded than is education for the non-retarded." Dist.Ct.Op. at 1113, App. 845. Although this analogy between habilitation and education indeed may be apt, the district court erred in stating that under Plyler the state may burden education only if the burden is justified by a substantial state interest. In Plyler, the Supreme Court applied intermediate scrutiny to a statute that prohibited the disbursement of state funds for the education of the children of undocumented aliens. See 457 U.S. at 223-24, 102 S.Ct. at 2398. Plyler, however, expressly reaffirms the Court's holding in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 35, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973), that education is not a fundamental right and therefore that burdens on education are not subject to heightened scrutiny. See 457 U.S. at 221, 102 S.Ct. at 2396. It was the "unique circumstances" of a burden on education coupled with the disadvantaging of children of aliens that led to heightened scrutiny in Plyler, and the Court subsequently has expressly limited Plyler to those circumstances. See Kadrmas v. Dickinson Public Schools, --- U.S. ----, 108 S.Ct. 2481, 2487-88, 101 L.Ed.2d 399 (1988) (refusing to overturn as violative of equal protection a law authorizing a school bus user fee).[5] Thus, the analogy between education and habilitation cannot help the class.
 
 
 31
 The class members also contend that heightened scrutiny is appropriate because their fundamental rights to family integrity and to freedom from unnecessary institutionalization have been burdened by the cut of habilitative services. The Supreme Court has held that "any classification which serves to penalize the exercise of [a fundamental] right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional." Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) (emphasis in original). Furthermore, the Supreme Court previously has recognized the rights cited by the class to be fundamental. See Moore v. City of E. Cleveland, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (Constitution protects choices concerning family living arrangements); O'Connor v. Donaldson, 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975) (continued confinement of involuntarily committed, non-dangerous person capable of living alone or with family violates Constitution). The Supreme Court, however, has made it clear that not every burden on a fundamental right will give rise to heightened scrutiny. If a burden is sufficiently indirect, scrutiny will not be heightened. See Bowen v. Gilliard, 483 U.S. 587, 107 S.Ct. 3008, 3017-18, 97 L.Ed.2d 485 (1987) (upholding amendments that affected eligibility for Aid to Families with Dependent Children benefits, although evidence existed that families had changed their living arrangements in response to the amendments).
 
 
 32
 In the case before us, the district court found that "[w]ithout continued support in the form of direct habilitative services or family support services, it will be impossible for [some] members of the class to remain in the family home." Dist.Ct.Op. at 115, App. 851. But the Supreme Court has stated that the fact "[t]hat some families may decide to modify their living arrangements in [response to government action], does not transform the [action] into an act whose design and direct effect is to 'intrud[e] on choices concerning family living arrangements.' " See Gilliard, 107 S.Ct. at 3017 (quoting Moore, 431 U.S. at 494, 97 S.Ct. at 1933). The cut in habilitative services does not in itself require members of the class to leave their family homes or enter institutions (although it may make it more likely that they will do so). Because the burden on these fundamental rights is indirect, heightened scrutiny is inappropriate on this ground as well.
 
 
 33
 The standards for judicial review of equal protection claims thus dictate that minimum scrutiny be applied to this case. Therefore, the district court was required to uphold a classification made with the rational belief that the classification advances a legitimate governmental interest. Because the classification drawn by the defendants meets this minimum threshold, the district court erred by holding that it did not pass constitutional muster.
 
 IV.
 
 34
 The Commonwealth and Philadelphia also challenge the district court's conclusion that the cutbacks violate the substantive due process rights of those mentally retarded persons living at home. That court relied on two lines of cases that recognize certain liberty interests when the state holds an individual in custody or has created a special relationship with an individual. The district court, however, rendered its decision before the Supreme Court handed down its opinion in DeShaney v. Winnebago County Department of Social Services, --- U.S. ----, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Unfortunately, that broad, harsh decision eliminates all support for the district court's position, and we are constrained by it to hold that Philadelphia and the Commonwealth's cutbacks in services have not violated the class' substantive due process rights.
 
 
 35
 The facts of the instant case virtually are indistinguishable from those of DeShaney. While plaintiffs here base their claim on a Pennsylvania statute "assur[ing] within the State the availability of adequate ... mental retardation services for all persons who need them, regardless of ... residence," 50 Pa.Cons.Stat.Ann. Sec. 4201(1) (Purdon 1969 & Supp.1988), a Wisconsin law centralizing all handling of child abuse cases underlies the claim of Joshua DeShaney and his mother. See DeShaney, --- U.S. at ---- - ----, 109 S.Ct. at 1009-11 (Brennan, J., dissenting). The class asserts that operation of the statute creates a special relationship between the class members and Pennsylvania, obligating the state to continue its protection of them. Similarly, DeShaney involves the contention that having once taken Joshua into its custody to protect him from abuse by his father, and knowing that his father posed a danger to him, the state owed Joshua an affirmative duty to protect him in a reasonably competent manner. Id. at ----, 109 S.Ct. at 1004. Last, in the case before us, the Commonwealth and Philadelphia have extended services to the class members and now propose to reduce or eliminate them, admittedly causing harm to the class members. In DeShaney, despite repeated reports of abuse, the state failed to take adequate precautions to protect Joshua from his father, who finally beat him into a coma and a profoundly retarded state. Id. at ----, 109 S.Ct. at 1002. The parallels end here, however, for in DeShaney, the Supreme Court held that Joshua possessed no fourteenth amendment substantive due process right to protection by the state.
 
 
 36
 DeShaney begins with the proposition that in general the due process clause only restricts state action; it does not obligate the state to protect its citizens from one another. Id. at ---- - ----, 109 S.Ct. at 1002-03. The class attempts to distinguish DeShaney by arguing that in this case it is the Commonwealth, rather than private actors, that is causing the harm. They assert that it is the state's failure to maintain services to the mentally retarded living at home that results in their harm. This cessation of action by the state, however, in no way differs from the DeShaney situation. Just as in DeShaney, the retraction of state intervention permits the harm, but the harm in each case actively is caused by a source other than the state.
 
 
 37
 Next DeShaney rejects the contention that merely because the state knows of an individual's plight and has declared its desire to help him or her, a special relationship is created that obligates the state to protect or care for the individual. Id. at ----, 109 S.Ct. at 1004. In so doing, DeShaney overrules this court's opinion in Estate of Bailey by Oare v. County of York, 768 F.2d 503, 510-11 (3d Cir.1985). See DeShaney, --- U.S. at ---- & n. 4, 109 S.Ct. at 1004 & n. 4.[6] Thus, the class' contention that by creating its statutory scheme and embracing the class within the scheme, the state has created a special relationship requiring it to protect the class members must fail.[7]
 
 
 38
 DeShaney then distinguishes the affirmative duty allegedy owed to the general public under the special relationship rule from the affirmative duty it found the state owed to those in its custody in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (eighth amendment proscription on cruel and unusual punishment applicable to states through the fourteenth amendment mandates state provide adequate medical care to its prisoners), and Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (fourteenth amendment due process clause requires state to provide involuntarily committed mental patients with services required to protect them from themselves and others), and their progeny. Accordingly, the state continues to owe an affirmative duty to protect those physically in its custody. Id. --- U.S. at ---- - ----, 109 S.Ct. at 1004-05. The DeShaney opinion explains:
 
 
 39
 [I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf--through incarceration, institutionalization, or other similar restraint of personal liberty--which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.
 
 
 40
 Id. at ----, 109 S.Ct. at 1006 (footnote omitted).
 
 
 41
 In an attempt to bring its claims within Youngberg, and thus distinguish its case from DeShaney, the class contends that because Pennsylvania's statutory scheme requires the mentally retarded to enter the system through the BSU's, where a plan for their care, including a placement determination, is made, the state has custody over those mentally retarded assigned to live at home. Their reliance on state-provided services, they claim, makes them absolutely dependent upon the state. Similarly, it is asserted that cessation of services will end in literal incarceration.[8] DeShaney, however, forecloses the class' constructive custody argument because it makes clear that a "state's affirmative act of restraining the individual's freedom to act on his own behalf--through incarceration, institutionalization, or other similar restraint on personal liberty" is a prerequisite to the state's obligation to provide care. DeShaney, --- U.S. at ----, 109 S.Ct. at 1006. DeShaney distinguishes the facts of Joshua DeShaney's case from the Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), line of custody cases because Joshua's injuries occurred while he was in his father's care, not while he was in the state's custody. DeShaney, --- U.S. at ----, 109 S.Ct. at 1006. Under such guidance, it is impossible to find an affirmative state duty to protect the mentally retarded living at home.[9]
 
 
 42
 DeShaney also blocks any argument that by providing habilitative services in the past, the state has obligated itself to continue to provide those services. As the Court put it, "the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." Id. at ----, 109 S.Ct. at 1006. Similarly, DeShaney blocks Amici's contention that because of "the longstanding assumption and control by the government of the care and treatment of people with retardation," retarded people are uniquely dependent on the state, and thus that the state owes them a special duty. See Brief for Amici Curiae, The Association for Retarded Citizens of the United States, et al., at 47-48. As Justice Brennan noted in his dissent in DeShaney, the state of Wisconsin had acted in such a way as to make Joshua particularly dependent upon it for protection from abuse, see DeShaney, at ---- - ----, 109 S.Ct. at 1010-11 (Brennan, J. dissenting), but the majority found no substantive due process violation.
 
 
 43
 The district court also found that the reductions also violated the class' interest in the integrity of the family unit. As discussed above, however, see supra at 166-167, any burden on family integrity is indirect and thus will not give rise to a violation of substantive due process. See DeShaney, at ----, ----, 109 S.Ct. at 1003, 1006 (citing Harris v. McRae, 448 U.S. 297, 316-17, 100 S.Ct. 2671, 2687-88, 65 L.Ed.2d 784 (1980) (although right to abortion is constitutionally protected, there is no requirement that government provide financial resources for poor women to obtain abortions)). Appellee's argument that the cut of habilitative services burdens their substantive due process right to be free from unnecessary institutionalization is similarly foreclosed.
 
 V.
 
 44
 Appellees argue that even if we reverse the district court's judgment, we should remand the case to the district court for further development. Appellees point to the following issues that they believe should be resolved on remand: (1) whether state law creates a fourteenth amendment liberty interest in habilitation; (2) whether due process requires the right to a hearing before terminating habilitative services; and (3) whether the city defendants violated state law.
 
 
 45
 We do not believe that a remand is necessary. First, even if the state statute creates a liberty interest, in light of DeShaney, appellees would be unable to establish that they were deprived of this interest by the state. Second, hearings are required as a matter of procedural due process only when "termination involves state action that adjudicates important rights." Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970). The budget cut at issue in this case was not such an "adjudication." Third, appellees can pursue their state claims in state court. To this end, dismissal of the state law claims, which the district court never reached, should be without prejudice in a state forum.
 
 
 46
 Because we find no equal protection or substantive due process violation, we will reverse the injunctive order appealed from and remand this case to the district court with instructions to dismiss the complaint. We will vacate the contempt order as moot.
 
 
 
 [1]
 Philadelphia is both a city and a county. The Philadelphia city government functions in the mental retardation system the same way that the governments of the counties do in other parts of Pennsylvania
 
 
 [2]
 Early intervention programs stimulate development in preschool-aged mentally retarded children. App. 834
 
 
 [3]
 The Philadelphia Police and Fire Association for Handicapped Children, Inc. defines itself as a group "devoted to fulfilling the needs of people with handicaps in the City." Brief of Appellees at 2. The group boasts approximately 150 families as members, about two-thirds of which are officer families. The remaining third are associate members. Id. The group's retarded members range in age from childhood to adult and generally live at home. Id
 
 
 [4]
 The court heard testimony that many of those cared for in residential facilities had been institutionalized before and likely would be reinstitutionalized if their services were cut. App. 364-65, 803
 
 
 [5]
 Kadrmas questioned the constitutionality under the fourteenth amendment equal protection clause of a school bus service user fee. The Court rejected Kadrmas' contention that those who could not afford the fee were denied equal access to education, id. 108 S.Ct. at 2487, and that such a denial implicated heightened scrutiny. Particularly relevant to the district court's attempted analogy in the case before us, the Court rejected Kadrmas' reliance on a line of decisions Kadrmas characterized as holding "that the government may not withhold certain especially important services from those who are unable to pay for them." Id. at 2488 (citing Little v. Streater, 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981) (fee for blood test in a certain paternity action); Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) (bond required before appeal from certain civil landlord-tenant disputes could be had); Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (fees and cost of service in divorce actions); Smith v. Bennett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961) (filing fee for habeas corpus review); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (statute basing appellate review on purchase of trial transcript)). The Court distinguished these cases as "involv[ing] a rule that barred indigent litigants from using the judicial process in circumstances where they had no alternative to that process. Id. In contrast, it found that alternate transportation remained available to Kadrmas, even if taking advantage of it imposed "genuine hardships on the family." Id. "Such facts, however, do not imply that the equal protection clause has been violated." Id. According to the Kadrmas Court, they require only minimum scrutiny. Id
 
 
 [6]
 Stoneking v. Bradford Area School District, 856 F.2d 594 (3d Cir.1988), another case recognizing a special relationship, this time between a student who was sexually assaulted by a teacher, has been vacated and remanded by the Supreme Court for reconsideration in light of DeShaney, --- U.S. ----, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)
 
 
 [7]
 The class likens its members to foster children, who are neither incarcerated nor, the class claims, under twenty-four hour care. While the Supreme Court's DeShaney opinion expressly leaves open whether foster care rises to the level of incarceration or institutionalization, thus resulting in an affirmative duty, see DeShaney, at ---- n. 9, 109 S.Ct. at 1006 n. 9, the class, which has not been removed from parental custody, will not fit through this possible chink, id. at ----, 109 S.Ct. at 1006
 
 
 [8]
 The amici also note that the interest in freedom from restraint recognized in Youngberg has been read to include freedom from incarceration when the responsible professionals determine it is unnecessary and inappropriate. Brief for Amici Curiae at 40 (citing Savidge v. Fincannon, 836 F.2d 898, 906-07 (5th Cir.1988); Clark v. Cohen, 794 F.2d 79, 87 (3d Cir.), cert. denied, 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986); Thomas S. v. Morrow, 781 F.2d 367, 374-75 (4th Cir.), cert. denied, 476 U.S. 1124, 106 S.Ct. 1992, 90 L.Ed.2d 673 (1986)). This inappropriate treatment argument proves too much. Cessation of habilitation certainly will result in regression. Institutionalization, however, will occur only if, in the responsible professionals' judgment, the regression is so severe as to require it. In such a case, the institutionalization would not be inappropriate
 
 
 [9]
 The district court found that because the class members participated in state-sponsored day programs, they were in the custody of the state while participating in them. In light of DeShaney, we do not believe that such intermittent custody gives rise to an affirmative duty on the state's part